IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| SAMUEL ROCHELL MADISON, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 4:22-cv-809-O |
| | § | |
| BOBBY LUMPKIN, Director, TDCJ-CID, | § | |
| Respondent. | § | |

## OPINION AND ORDER

Before the Court is a petition for a writ of habeas corpus under 28 U.S.C. § 2254 filed by

Petitioner Samuel Rochell Madison ("Madison"), a state prisoner confined in the Correctional

Institutions Division of the Texas Department of Criminal Justice (TDCJ-CID). Madison filed a

form § 2254 petition with attachments, and an extensive handwritten brief. Pet. 1-20. ECF No. 1;

Brief 1-50, ECF No. 2. Respondent filed an excess page-response, and Madison filed a reply.

ECF Nos. 13, 19. After considering the pleadings and relief sought by Petitioner, the Court

concludes that the § 2254 petition must be **DENIED**.

## I.     BACKGROUND

### A.       Procedural History

Madison is in custody pursuant to three convictions out of the 2nd Judicial District Court,

Tarrant County, Texas in cause number 1407727D, styled *The State of Texas v. Samuel Rochell*

*Madison*. SHCR-01, at 8–13, ECF No. 15-15.[1] Madison was charged with and pleaded not guilty

---

1. "SHCR" refers to the Clerk's Record of pleadings and documents filed with the court during
Madison's state habeas proceedings. *See generally, Ex parte Madison*, No. 89,842-01 (Tex. Crim. App.
2019). "RR" refers to the statement of facts of the jury trial in the Reporter's Record, preceded by the
volume number and followed by the page number(s). "CR" refers to the Clerk's Record of pleadings and

to three counts of indecency with a child by contact. *Id.* at 6–7; 2 RR 9-10, ECF No. 15-2.  On October 26, 2016, following a bench trial, the trial court found Madison guilty and sentenced him to 10 years' imprisonment on each count, the sentences to run concurrently. SHCR-01, at 8–13, ECF No. 15-15; 3 RR 119–122, ECF No. 15-3. The Second Court of Appeals of Texas affirmed Madison's conviction on April 5, 2018. *See Madison v. State*, No. 02-16-00420-CR, 2018 WL 1630773 (Tex. App. Fort Worth, 2018). The Texas Court of Criminal Appeals (TCCA) refused Madison's petition for discretionary review (PDR) on June 6, 2018. *Madison v. State*, PD-0457-18 (Tex. Crim. App. 2018).

Madison filed an application for a state writ of habeas corpus challenging his convictions on October 10, 2018. SHCR-01, at 65, 115, 165, ECF No. 15-15. On May 18, 2022, the TCCA denied the application without written order on findings of the trial court after a hearing and on the court's independent review of the record. *Id*. at "Action Taken" Sheet, ECF No. 15-14. Madison then filed the instant petition on August 30, 2022. Pet. 10, ECF No. 1.

### B.    Factual Overview

The state appellate court thoroughly summarized the evidence in this case on direct appeal:

> Girl, who was eleven years old at the time of the bench trial, testified that when she was roughly eight years old, she, her brother, and her mother (Mom) lived with Mom's boyfriend Madison in a two-bedroom apartment. Girl said that she did not like living with Madison. Although she was initially reluctant to say why, Girl eventually recounted how, when the two were alone, Madison would intentionally touch her over her clothes with his hand in the area where she urinates from.
>
> When asked how many times this had happened, Girl first responded "I don't remember." When asked whether it had happened "one time or many times," Girl

---

documents filed during the underlying proceeding.

said "[m]any times." But Girl said that she could not remember how many times. When asked if it had happened more than ten times, Girl said "I don't know." Girl said that the touches occurred when she was in Madison's room, and that although it had not occurred every time she would go in his room, she agreed it had happened on different occasions. When asked specifically if it had happened more than once, Girl said "More than once."

By Girl's account, she did not initially tell Mom when this first started happening because she was "scared," but later she disclosed to Mom what had been happening. Girl averred that after she told Mom, Mom told her they would be moving out the next morning. Girl said that she was relieved to know she would no longer be around Madison.

On cross-examination, Girl said that Madison sometimes touched her in this manner when Mom was in the apartment, but other times when she was not. Specifically, Girl said that Mom was either "somewhere in the house or at work or out grocery shopping or ...." But Girl was not allowed to finish her answer before defense counsel posed another question to her. When asked whether this had occurred when she and Madison were wrestling, Girl said "I can't remember."

Mom testified that she met Madison, a neighbor in her apartment complex, in November 2013. According to Mom, after she and Madison became friends, their relationship evolved into a romantic one and eventually she and Girl moved in with Madison. Mom stated that at first, Girl and Madison got along wonderfully and that they "hung out constantly." By Mom's account, Madison lavished Girl with gifts, including "My Little Ponies, video games, [and] a bird" and he even "made like a whole little My Little Pony fortress" for her in his bedroom, which he initially shared with Mom.

Mom averred that after a few months she realized that she and Madison were incompatible and that the two had decided to stop seeing each other romantically but had remained friends. Mom testified that one day Girl did not want to come out of her room because she said that she was "sad" and that the following day Girl asked that her stuff be moved out of Madison's room and into her own. Mom also noticed that Girl's demeanor had changed. After Girl once again remained in her room all day, Mom went to her and asked if something had happened—Girl said only that she "just [did not] feel good."

In late October 2014, just after Mom had come home from work, Girl went to her and said, "You know how you talked to me[,] mom[,] about why I'm sad?" After Mom acknowledged the conversation, Girl said that Madison made her uncomfortable and that he would touch her on her "privates." Specifically, Mom

3

alleged that Girl told her that she "didn't notice at first" because she thought "he was just accidentally doing it when [she and Madison] played ... But he does it now even when we're not playing, even when we're not wrestling." Mom said that she could not get any more information from Girl and that Girl shut down on her and said that she did not want to talk about it anymore. When asked whether Girl indicated that these touches seemed "like it was something that just happened one time," Mom replied "No, no."

Mom said that she did not confront Madison that evening when he came home from work and that after he left for work the next morning, she and her former sisters-in-law moved her, Girl's, and her son's things out in under two hours. Mom, who had less than $40 at that point, moved in temporarily with a friend. Later that day, Mom called the Department of Family and Protective Services and reported what Girl had told her.

Girl's Aunt testified at trial as well. Aunt described how on October 27, 2014, Mom called her very distressed. Specifically, Aunt said that Mom called her to say that Girl had just told her that Madison had been touching Girl inappropriately and to say that she needed to move out of the apartment right away. Aunt described how she and Mom discussed and then executed a plan to move all of Mom's and Girl's belongings out of the apartment the next morning immediately after Madison left for work.

Donovan Boswell testified that the Department assigned her to investigate Girl's case after Mom's call. Boswell said that she "screen[ed]" Girl a few days after the call and that during the interview Girl initially "kind of opened up a little bit," but that as the interview went on and began to delve into the indecent contact, Girl "became more ... withdrawn." Specifically, Boswell said that it appeared as though Girl did not want to talk about the allegations but that she did eventually describe the indecent contact. Girl told Boswell that Madison had touched her over her clothes and on her vaginal area and that he had done it more than once. After learning the details of the abuse, Boswell contacted Detective Tony Miller of the Haltom City police. From there, Boswell coordinated and attended a forensic interview of Girl. Miller also attended the interview.

During cross-examination, Boswell acknowledged that her notes indicated that both Mom and Girl had reported that Madison had touched Girl "several times over clothes while they were wrestling around." Boswell acknowledged, however, that she did not remember Girl stating that these events occurred while "wrestling," but Boswell averred that she gathered that information from the Department's forensic interview request. Donovan could not remember if the term "wrestling" appeared in her own report.

4

Miller testified that in addition to attending the forensic interview, which he described as "consistent" with the report he had received regarding Girl's outcry, he also interviewed Madison at the police station. The State published a video of the interview for the trial judge. In the video, Miller tells Madison that the reason he was there was because Girl had alleged that he had touched her "on her private area, over the top of her clothes, on more than one occasion." In the video, Miller can also be heard telling Madison that what Girl had reported was more than just "touching" but rather that Madison had been "rubbing" ... "her with [his] hand on her vagina over her clothes." In response to this, Madison stated that Mom had described Girl as a "vicious liar" and that her lying may in part be the reason she had made her outcry.

The video also reveals Madison stating that Mom may have had Girl make up the outcry because he had refused Mom's advances a few nights before and that she wanted a reason to move out of the apartment suddenly without having to fulfill her commitment to their lease and having to pay restoration for damage her dog had caused to Madison's entertainment center. Later in the interview, Madison stated that he believed perhaps some sort of "accident" between him and Girl must have occurred.

Lindsey Dula, director of program services and a forensic interviewer for the Alliance for Children, testified as well. Dula said that during her interview, Girl would generally be talkative and engaging regarding neutral subjects but that when Dula would question her about the allegations, her demeanor would change to being more subdued.

Marx Madison, Madison's brother, testified for the defense. Marx averred that Madison, three of his children, and Girl had attended a Madison family reunion the summer prior to these allegations and that Girl acted as though she trusted Madison and felt comfortable around him. He also said that he had no reservations about Madison being around children.

Madison testified in his own defense. Regarding how he and Mom came to live together, Madison testified to much of the same narrative that Mom testified to. Like Mom, Madison described an exuberant child who liked to play with her toy ponies and watch TV in the couple's bedroom. Madison also said that Girl would sometimes sleep in the bed at night between the couple.

Madison averred that once Mom's son began to spend more time at the apartment during the summer months, Girl moved half of her ponies into her own bedroom that she shared with her brother. Eventually, according to Madison, he and Mom broke off their romantic relationship and Mom began to stay in the same room as Girl and Mom's son.

5

Madison explained that after he had purchased a parakeet for Girl, Mom purchased a large dog for her son. By Madison's account, the dog chewed on his expensive furniture and this upset him. After having shown the damage to Mom, Madison said that he remained upset. Shortly after, according to Madison, Mom got "all dressed up" one evening, came into his bedroom, locked the door, and asked him to have sex with her. Allegedly, he rejected her because he was still upset about the furniture, and this caused Mom to cry and leave the room while slamming the door. Madison said that he "knew there was something coming after that."

Madison further testified that he believed that the allegations of him having touched Girl inappropriately had come from Mom because he had "humiliated" Mom when he rejected her advances. Madison described himself as a man of faith, but he asserted that Mom was a professing "witch."

Madison also said that Girl's behavior never changed toward him while she lived with him and that she was always "a very happy well-adjusted child." Madison averred that he spent less time with Girl during the last days that she lived in the apartment because Mom had "pulled her kids back behind the door" of Girl's bedroom. Madison said that he never touched Girl inappropriately and that Girl was "lying."

The State called three rebuttal witnesses, all of whom had been Girl's teachers in the recent past. All three averred that Girl was a smart, responsible, disciplined, and truthful child.

The trial court found Madison guilty of all three counts of indecency with a child by contact and assessed punishment at ten years' confinement.

*Madison*, 2018 WL 1630773, at *1–3 (footnotes omitted).

## II.    ISSUES

The Court understands Madison to allege the following grounds for relief:

1. The trial court lacked jurisdiction to convict him because his indictment was defective;

2. He is actually innocent;

3. His convictions violate the Double Jeopardy Clause;

4. Defense counsel provided ineffective assistance by forcing Madison to waive a

jury trial, failing to investigate, failing to present character witnesses and consult an expert witness, failing to put on exculpatory evidence, and failing to object to inadmissible testimony; and

5. The state suppressed exculpatory evidence in violation of *Brady* and used perjured testimony.

Pet. 6-7, ECF No. 1; Brief 4-50, ECF No. 2.[2]

## III.   ANALYSIS

### A.   Standard of Review

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Antiterrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the AEDPA, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)–(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting the presumption of correctness by

---

[2] Counsel for the Respondent addressed Madison's claims in detail as listed here. Resp.15-34, ECF No. 13. The Court agrees with the manner in which the claims were addressed by Respondent.

clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

Finally, when the TCCA, the state's highest criminal court, refuses discretionary review or denies state habeas-corpus relief without written order, opinion, or explanation, typically it is an adjudication on the merits, which is likewise entitled to this presumption. *Richter,* 562 U.S. at 100; *Singleton v. Johnson,* 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres,* 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). In such a situation, a federal court "should 'look through' the unexplained decision to the last related state-court decision" providing particular reasons, both legal and factual, and "presume that the unexplained decision adopted the same reasoning," and give appropriate deference to that decision. *Wilson v. Sellers,* — U.S. —, 138 S. Ct. 1188, 1192 (2018).

## B.     Defective Indictment (Ground One)

Madison claims that the trial court lacked jurisdiction to convict him because the indictment was defective. Pet. 6, ECF No. 1; Brief 4-9, ECF No. 2. But Madison concedes that he failed to properly present this allegation to the TCCA. Pet. 8, ECF No. 1, at 8; State Writ Application 22-63, ECF No. 15-15. This Court is now barred from reviewing this claim on the merits because the TCCA would find the allegation to be procedurally barred under the Texas abuse of the writ doctrine. See Tex. Code Crim. Proc. 11.07 § 4.

The normal rule that a state court must explicitly apply a procedural bar to preclude federal review does not apply to cases where a petitioner fails to exhaust his state court remedies and the state court to which he would be required to present these unexhausted claims would now find them to be procedurally barred. *Coleman*, 501 U.S. 722, 735 n.1 (1999). In such cases,

the federal procedural default doctrine precludes federal habeas corpus review. *Id.*; *see Gray v. Netherland*, 518 U.S. 152, 161–162 (1996); *Teague v. Lane*, 489 U.S. 288, 298–99 (1989) (finding an unexhausted claim to be procedurally barred); *Nichols v. Scott*, 69 F.3d 1255, 1280 n.48 (5th Cir. 1995) (finding several unexhausted claims would be barred by the Texas contemporaneous objection rule; thus, federal habeas corpus review was procedurally barred).

Here, Madison failed to exhaust his defective-indictment claim. Should Madison now present this claim to the TCCA in another state writ application, that court would find review of the claim to be procedurally barred under the Texas abuse of the writ doctrine. Tex. Code Crim. Proc. Art. 11.07 § 4; *see Ex parte Whiteside*, 12 S.W.3d 819, 821 (Tex. Crim. App. 2000) (article 11.07, section 4 of the Texas Code of Criminal Procedure applies to all subsequent applications). Upon his return to federal court, Madison's claim would then be barred from federal habeas review under the federal procedural default doctrine. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995) (finding the Texas abuse of the writ doctrine to be an adequate procedural bar for purposes of federal habeas review). Accordingly, this Court finds that the Texas abuse of the writ doctrine, now codified in Article 11.07 section 4 of the Texas Code of Criminal Procedure, bars this Court from considering Madison's unexhausted claim.

To overcome this procedural bar, Madison must demonstrate either cause and prejudice for his default, or that a fundamental miscarriage of justice would result from this Court's refusal to consider his claim. *Fearance*, 56 F.3d at 642 (citing *Coleman*, 501 U.S. at 750–51). He is unable to do this. Madison clearly had the opportunity to raise this particular claim in his state writ and failed to do so. See SHCR-01, at 17-65, ECF No. 15-15.  Madison acknowledges that this is the first time he raises this claim and explains that he just learned of it while preparing his

9

pro-se petition. Pet. 8, ECF No. 1. Madison's ignorance of the possible claim is not an excuse for failure to raise it in his state writ application. *See Saahir v. Collins*, 956 F.2d 115, 118–19 (5th Cir. 1992) (holding neither prisoner's pro se status nor ignorance of the law constitutes "cause" for failing to include a legal claim in his prior petition). As a result, his defective indictment claim is not cognizable in federal writ proceedings. *Gray*, 518 U.S. at 162. Accordingly, Madison's unexhausted claim is procedurally barred from federal habeas review, and this ground must be denied.

### C.    Actual Innocence (Ground Two)

Madison contends that he is actually innocent as supported by "new evidence."  Pet. 6, ECF No. 1; Brief 34-37, ECF No. 2.

The Fifth Circuit has held that a freestanding claim of actual innocence—without a claim of a constitutional violation—is not cognizable on federal habeas review. *Herrera v. Collins*, 954 F.2d 1029, 1034 (5th Cir. 1992); *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003); *see also Foster v. Quarterman*, 466 F.3d 359, 367–68 (5th Cir. 2006); *In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009). "[F]ederal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution--not to correct errors of fact." *Herrera v. Collins*, 506 U.S. 390, 400 (1993) (citations omitted). Madison has not shown an independent constitutional violation; thus, insofar as Madison raises a freestanding actual innocence claim, his allegation does not present a claim for federal habeas corpus relief.  This ground must be denied.

### D.    Double Jeopardy (Ground Three)

Madison asserts that his convictions on three counts of indecency with a child by contact violate Double Jeopardy. Pet. 6, ECF No. 1; Brief 36, ECF No. 2. Review of this claim shows

10

the allegation is without merit because the victim testified to numerous, distinct incidents of fondling, each of which can support a separate conviction.

The Fifth Amendment guarantee against double jeopardy, enforceable against the States through the Fourteenth Amendment, "consist[s] of three separate constitutional protections. It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711 (1969) (footnotes omitted). Here, Madison has been subjected to a single prosecution, and all the charges against him were disposed of in one proceeding. Hence, neither of the first two protections of the due process clause are applicable to his case. *See Missouri v. Hunter*, 459 U.S. 359, 365–66 (1983). Only the third protection is applicable to this case.

In *Blockburger v. United States*, 284 U.S. 299, 304-05 (1932), the Supreme Court set forth the test to determine whether a prosecution is barred by double jeopardy. "If each different statutory offense requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." *United States v. Marden*, 872 F.2d 123, 125 (5th Cir. 1989) (citation omitted). Further, "[t]he *Blockburger* test has nothing to do with the evidence presented at trial. It is concerned solely with the statutory elements of the offenses charged." *Davis v. Herring*, 800 F.2d 513, 517 (5th Cir. 1986) ("the *Blockburger* test is to be applied to the elements of proof required by the statute and not to the actual evidence or proof adduced at trial in a given case.").

Madison was charged with three counts of indecency with a child by contact, and the trial court, in a single proceeding, found Madison guilty of all three counts. SHCR-01, at 8-13, ECF

11

No. 15-15. The victim, K.C., testified that the fondling happened "many times" and "on different occasions" but was unable to give a specific number of times. 2 RR 27, 34, ECF No. 15-2. After considering all the evidence, the trial court found that the offenses occurred on or about June 1, 2014, July 1, 2014, and September 1, 2014. 3 RR 116–17, ECF No. 15-3. These convictions involved separate offenses, each with a distinct element the State had to and did prove, therefore satisfying the *Blockburger* test.

Madison has failed to show a double jeopardy violation.  As stated earlier, this Court cannot grant habeas corpus relief unless it determines that the state court's determination was in conflict with clearly established federal law as determined by the Supreme Court or "was based on an unreasonable determination of the facts in light of the evidence." 28 U.S.C. § 2254(d). Madison has not made this showing. Ground Three must be denied.

### E.      Ineffective Assistance of Trial Counsel (Ground Four)

Madison alleges that his trial counsel, Gregory E. Gray, provided ineffective assistance by forcing him to waive his right to a jury trial, failing to investigate, failing to present character and expert witnesses, failing to present exculpatory evidence, and failing to object to inadmissible testimony. Pet. 7, ECF No. 1; Brief 37-50, ECF No. 2. These claims are refuted by the record and without merit.

#### 1.      Standard for Review of Ineffective Assistance Claims

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey,* 469 U.S. 387, 393–95 (1985); *Strickland v. Washington,* 466 U.S. 668, 688 (1984). An ineffective-assistance claim is governed by the familiar standard set forth in *Strickland v. Washington,* under which a petitioner must show that

(1) counsel's performance fell below an objective standard of reasonableness, and (2) but for counsel's deficient performance the result of the proceeding would have been different. *Strickland,* 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697. In applying this standard, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy. *Id.* at 688–89. Judicial scrutiny of counsel's performance must be highly deferential, and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689.

To satisfy the prejudice prong of *Strickland*, Madison must show that counsel's errors were so serious as to deprive the defendant a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687. The petitioner may not simply allege but must "affirmatively prove" prejudice. *Id.* at 693. In order to demonstrate prejudice, the convicted defendant must show that as a result of trial counsel's unprofessional errors, there exists a reasonable probability that the result of the proceeding would have been different. *Id.* at 694; *see Carter v. Johnson*, 131 F.3d 452, 463 (5th Cir. 1997) ("In evaluating claims of ineffective assistance during the guilt stage of the trial, the petitioner must show a 'reasonable probability' that the jury would have otherwise harbored a reasonable doubt concerning guilt."); *Armstead v. Scott*, 37 F.3d 202, 207 (5th Cir. 1994) ("A mere allegation of prejudice is not sufficient to satisfy the prejudice prong of the *Strickland* test.")). Because a convicted defendant must satisfy both prongs of the *Strickland* test, failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *Strickland*, 466 U.S. at 687; *Black v. Collins*, 962 F.2d 394, 401 (5th Cir. 1992).

Further, a reviewing court is required to presume that counsel has rendered adequate

13

assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 690; *Amos v. Scott*, 61 F.3d 333, 347–48 (5th Cir. 1995). The Court must examine the proceedings as a whole, giving due consideration to the weight of the evidence supporting the verdict and evaluating the alleged failings of counsel in that total setting. *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999).

<blockquote>2. <u>"Doubly Deferential" Review to State Trial Court's Resolution of Ineffective Assistance Claims</u></blockquote>

As a preliminary matter, all of Madison's ineffective assistance claims were resolved against him by the state habeas court when it denied his claims on the merits. See SHCR-01, at "Action Taken" Sheet, ECF No. 15-14. Where a petitioner's ineffective-assistance-of-counsel claims have been reviewed on their merits under the *Strickland* standard and denied by the state courts, federal habeas relief will be granted only if the state courts' determination involved an unreasonable application of *Strickland* in light of the state-court record, a substantially higher threshold. *Harrington*, 562 U.S. at 100–01 (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)); *Bell v. Cone*, 535 U.S. 685, 698–99 (2002). As the Supreme Court has explained, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Thus, a federal court's review of state-court decisions regarding ineffective assistance of counsel must be "doubly deferential" so as to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)).

<blockquote>3. <u>Waiver of Jury Trial</u></blockquote>

Madison's first ineffective assistance claim is that counsel forced him to waive his right to a jury trial and proceed with a bench trial. Pet. 7, ECF No. 1; Brief 40-41, ECF No. 2. This claim is unsupported by the trial record and the state habeas court's findings. When he raised this claim on state habeas review, the state trial court made the following findings:

> 41. Applicant admitted that he and counsel had "'ample opportunity to review this case." [2 RR 6, ECF No. 15-2]
>
> 42. Applicant admitted that he and applicant had several conversations about whether he should be tried by a jury or judge. [*Id.*]
>
> 43. Counsel advised Applicant to be tried by a jury. *See* SHCR-01 at 176 (Gray Affidavit), ECF No. 15-15; [2 RR 6, ECF No. 15-2].
>
> 44. Against counsel's advice, Applicant decided to be tried by the court. *See* SHCR-01 at 177 (Gray Affidavit), ECF No. 15-15; [2 RR 6, ECF No. 15-2].
>
> 45. Applicant stated on the record that he had no questions regarding his waiver of the jury trial. [2 RR 7, ECF No. 15-2]
>
> 46. Counsel advised Applicant that Applicant would not be eligible for community supervision if the judge heard the case. [*Id.*]
>
> 47. Applicant testified that, even with knowing that he would not be eligible for community supervision, he still wanted to be tried by the trial court. [*Id.*]
>
> 48. Applicant's claim that counsel advised him to waive his right to a jury is without merit.

SHCR-01, at 261–62, ECF No. 15-15. Because Madison fails to show that the State court's decision was an unreasonable application of the *Strickland* standard, this claim must be denied.

### 4.    Failure to Investigate

Madison also asserts that Gray failed to investigate the case, which would have uncovered exculpatory material. Brief 41-42, ECF No. 2. This conclusory allegation will not afford Madison federal habeas relief because, to establish his failure to investigate claim, he must

15

allege with specificity what a proper investigation would have revealed and how it would have benefitted him. *United States v. Glinsey*, 209 F.3d 386, 393 (5th Cir. 2000) (citing *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989)). Under *Strickland*, a petitioner cannot "simply allege but must affirmatively prove prejudice" when complaining of counsel's failure to investigate. *Wilkerson*, 950 F.2d 1054, 1065-65 (5th Cir. 1992). Here, Madison fails to show that counsel did not investigate or how further investigation would have aided his cause. *See Smith v. Maggio*, 696 F.2d 365, 367 (5th Cir. 1983) (holding counsel not deficient for failing to investigate when investigation was, in fact, conducted). Making no showing that mitigating evidence actually existed, Madison's claims must be denied.

Furthermore, when Madison raised this claim on state habeas review, the trial court found that Madison presented "no evidence that there was material and exculpatory evidence that counsel would have discovered had he done additional investigation" and "[t]here is no credible evidence that a reasonable likelihood exists that the outcome of the proceeding would have been different had counsel conducted more pre-trial investigation." SHCR-01, at 260–61, ECF No. 15-15. Madison repeats the same conclusory claim from his state habeas application and fails to overcome the presumption that counsel's actions were within the range of effective representation.

    5.    Failure to Present Character and Expert Witnesses

Madison complains that Gray was ineffective for failing to retain an expert witness and present testimony from family and friends who would have testified about their knowledge of the relationship between Madison and the victim. Pet. 7, ECF No. 1; Brief 45–46, ECF No. 2.

The presentation of witness testimony is essentially strategy and within the trial counsel's

domain. *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985); *Boyd v. Estelle*, 661 F.2d

388, 390 (5th Cir. 1981). A petitioner must overcome a strong presumption that his counsel's

decision in not calling a particular witness was a strategic one. *Murray v. Maggio*, 736 F.2d 279,

282 (5th Cir. 1984). "[T]o prevail on an ineffective assistance claim based on counsel's failure to

call a witness, the petitioner must name the witness, demonstrate that the witness was available

to testify and would have done so, set out the content of the witness's proposed testimony, and

show that the testimony would have been favorable to a particular defense." *Day v. Quarterman*,

566 F.3d 527, 538 (5th Cir. 2009) (citations omitted). This showing is required for both expert

and lay witnesses. *Id.* Hypothetical or theoretical testimony will not justify the issuance of a

writ. *Martin v. McCotter*, 796 F.2d 813, 819 (5th Cir. 1986).

   Madison lists a number of family and friends whom he claims would have testified on his

behalf. Brief 39, ECF No. 2. But he provides no evidence besides his conclusory assertions that

these people were available to testify, would have testified favorably, or that their testimony

would have changed the outcome of the trial. *Day*, 566 F.3d at 538. In fact, Madison's brother

testified at trial that he observed K.C. and Madison interact over several days during a family

reunion at his home and K.C. seemed to trust Madison and enjoy being with him. 3 RR 9–10,

ECF No. 15-3. He also testified that he trusted Madison with his own children or other young

family members. 3 RR 13–14., ECF No. 15-3. Duplicitous testimony from other family members

is unlikely to have had any effect on the outcome of the trial.

   Madison also names Dr. Alexandria Doyle as an expert that would have testified on his

behalf, based on her testimony at his state habeas hearing. Brief 45, ECF No. 2. After hearing Dr.

Doyle's testimony and counsel's explanation for why he chose not to consult with an expert in

17

this case, the State habeas court concluded that "Gray's decision to not consult an expert in this case was the result of reasonable trial strategy." 2nd Supp. SHCR-01, at 133, ECF No. 15-17. Madison's bare assertions to the contrary are insufficient to prove that his attorney was ineffective. *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) (to demonstrate *Strickland* prejudice [Madison] must show not only that the testimony would have been favorable, but also that the witness would have testified at trial) (citations omitted).

### 6.     Failure to Present Exculpatory Evidence

Madison asserts that Gray failed to present exculpatory evidence provided to him. Pet. 7, ECF No. 1; Brief 33-35, ECF No. 2. The alleged "exculpatory evidence" consists of polygraph results, a "summary of the truth" written up by Madison, text messages between Madison and the victim's mother, and his analysis of the victim's forensic interview. CR 26–93, ECF No. 15-5. Rather than amounting to exculpatory evidence, these items merely represent Madison's "side of the story," which he was able to present to the trial court when he testified in his own defense. 3 RR 15–94, ECF No. 15-3. Thus, this claim must be denied.

### 7.     Failure to Object to Inadmissible Testimony

Finally, Madison asserts that Gray was ineffective for failing to object to inadmissible testimony suggesting that the victim's outcry was credible. Brief 44-45, ECF No. 2. Specifically, Detective Miller testified that he did not see "any of those circumstances of coaching or false outcry" in K.C.'s interview, and that her outcry, interviews, and statements were consistent. 2 RR 152, 177–78, ECF No. 15-2.  Madison raised this claim on state habeas review and a hearing was held in which Gray testified to his trial strategy. Gray averred that, while Detective Miller's testimony "could have been objectionable," he chose not to object because it was a bench trial

18

and he knew that the trial court was aware of the law and would not be swayed by personal opinion. Post - Conviction Hearing RR 22–23, ECF No. 15-38. The habeas court found that this decision was the result of reasonable trial strategy and "there was no credible evidence that counsel's representation fell below an objective standard of reasonableness." 2nd Supp. SHCR-01, at 138–39, ECF. No. 15-17.

As explained above, when a petitioner's ineffective assistance claims have been reviewed on their merits and denied by the state court, federal habeas relief will be granted only if the state court's decision was contrary to or involved an unreasonable application of the standard set forth in *Strickland*. *See Haynes v. Cain*, 298 F.3d 375, 379 (5th Cir. 2002); *Santellan v. Cockrell*, 271 F.3d 190, 198 (5th Cir. 2001). Madison failed to meet his burden. The state court's denial of relief on all of Madison's claims of ineffective assistance of counsel was reasonable, and he has not overcome the "doubly" deferential assumption in favor of the state court denial. *Tidlow*, 571 U.S. at 15. Therefore, Madison has not shown that he is entitled to relief on his claims of ineffective assistance of counsel.

### F.   Prosecutorial Misconduct/Error (Ground Five)

Madison's last ground for relief is that the prosecutor erred by suppressing *Brady* material and putting on perjured testimony. Pet. 7, ECF No. 1; Brief 50, ECF No. 2. This allegation is conclusory and not supported by the record.

### 1.   Applicable Standard of Review

The appropriate standard of review for a claim of prosecutorial error on a writ of habeas corpus is "the narrow one of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). The relevant question is whether

the prosecutor's actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643; *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1985). "Although the asserted prosecutorial misconduct may have made the defendant's trial less than 'perfect,' that imperfection must have rendered the trial 'unfair' in order to be 'constitutional error.'" *Rogers v. Lynaugh*, 848 F.2d 606, 609 (5th Cir. 1988) (citing *Darden v. Wainright*, 477 U.S. 168, at 183 (1986))." The test applied to determine whether a trial is fundamentally unfair is whether there is a reasonable probability that the verdict might have been different had the trial been properly conducted." *Id*. (citations omitted).

2.   <u>*Brady* Violation</u>

Madison asserts that the State "suppressed" the victim's forensic interview by failing to play the video at trial or call Ashley Johnson to testify, either of which would have presented exculpatory evidence. Brief 50, ECF No. 2. Essentially, Madison complains that the State did not present exculpatory evidence in its own case-in-chief. *Id.* Madison, however, misunderstands the role of the parties in this trial. The State is not required to try Madison's case for him or to present evidence of which he was already aware.

The Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), held that the suppression by the prosecution of evidence favorable to an accused after a request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution. To establish a *Brady* violation, Madison must prove the following: (1) the prosecutor suppressed or withheld evidence; (2) which was favorable; and (3) material to the defense. *Moore v. Illinois*, 408 U.S. 786, 794–95 (1972); *Ogle v. Estelle*, 641 F.2d 1122, 1124 (5th Cir. 1981). The evidence is material only if there is a reasonable probability that,

20

had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 684 (1985). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *Id.* at 678, 684. Finally, in *Schlang v. Heard*, the Fifth Circuit held that "[m]ere conclusory statements do not raise a constitutional issue in a habeas case." *Schlang v. Heard*, 691 F.2d 796, 799 (5th Cir. 1982).

Madison fails to establish that his *Brady* claim has merit. *Brady* claims involve "the discovery, after trial of information which had been known to the prosecution but unknown to the defense." *West v. Johnson*, 92 F.3d 1385, 1399 (5th Cir. 1996) (citation omitted). Here, there was no newly discovered evidence because nothing was suppressed or withheld from the defense. Evidence is not "suppressed" if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence. *West*, 92 F.3d at 1399. In this case, the State gave Madison notice of the victim's outcry statement to Ashley Johnson along with a summary of the forensic interview on November 18, 2015, nearly a year before trial. CR 98–106. ECF No. 15-5. The State also provided Madison with a *Brady* disclosure on October 5, 2016 (two weeks before trial) stating that Ashley Johnson no longer worked for Alliance for Children, believed she was no longer an expert on the forensic interview of children, and had "purged her mind" after leaving her position with Alliance for Children. CR 116–17, ECF No. 15-5.   Therefore, Madison was aware of the supposedly exculpatory evidence at the time of trial and had the opportunity to present that evidence to the jury in his own case-in-chief. The government was not obligated to furnish information that is fully available to the defendant or that could be obtained through reasonable diligence. *Blackmon v. Scott*, 22 F.3d

21

560, 564–65 (5th Cir. 1994) (citation omitted); *May v. Collins*, 904 F.2d 228, 231 (5th Cir. 1990) (same).

### 3.   Perjured Testimony

Madison claims that the prosecutor allowed Detective Miller to give perjured testimony. Brief 50, ECF No. 2.While the use of perjured testimony may violate due process, "[t]o obtain a reversal based upon a prosecutor's use of perjured testimony or failure to correct such testimony, a habeas petitioner must demonstrate that '(1) the testimony was actually false, (2) the state knew it was false, and (3) the testimony was material.'" *Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir. 1998).

Here, Madison asserts that Detective Miller's testimony conflicted with his written report and Madison's recorded police interview. Brief 28-31, ECF No. 2. Contradictory testimony from witnesses, inconsistencies within a witness's testimony, and conflicts between reports, written statements and the trial testimony of prosecution witnesses do not, standing alone, establish perjury. *See Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990) (holding that contradictory testimony from witnesses or inconsistencies in a witness's testimony at trial are to be resolved by the trier of fact and do not suffice to establish that certain testimony was perjured); *United States v. Martinez-Mercado*, 888 F.2d 1484, 1492 (5th Cir. 1989) (holding that the omission of certain facts from the reports and written statements of the prosecution's witnesses, alone, is not adequate to put the prosecution on notice of perjury on their part, much less establish such perjury in fact occurred); *United States v. Viera*, 819 F.2d 498, 502 (5th Cir. 1987) (holding that inconsistencies between pre-trial and in-trial testimony do not, standing alone establish perjury or put the prosecution on notice of possible perjury). Madison fails to conclusively prove that the

testimony given was actually false, that the prosecutor was actually aware of the alleged perjury, or that the testimony was material. He makes only conclusory allegations regarding contradictory or inconsistent statements, which do not alone establish perjury. A conclusory allegation does not raise a constitutional issue in a habeas corpus proceeding. *Ross*, 694 F.2d at 1012.

Since Madison cannot establish any error by the prosecution, much less an error of such magnitude that it rendered his entire trial unfair, his claims of prosecutorial error are without merit and must be denied.

### G.    Deference to State Court Findings and Conclusions

Finally, as explained above, this Court must defer to the state court determinations and deny habeas relief. The state habeas court determined that Madison's claims lacked merit. SHCR-01, at "Action Taken" Sheet, ECF No. 15-14;  *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *see Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997) ("In our writ jurisprudence, a 'denial' signifies that we addressed and rejected the merits of a particular claim while a 'dismissal' means that we declined to consider the claim for reasons unrelated to the claim's merits.").

Here, the same state court judge, the Honorable Wayne Salvant, presided over both Madison's trial and state habeas proceedings. See SHCR-01, at 2 (Clerk's Summary Sheet), 8–13 (Judgments), ECF No. 15-15. The trial court made credibility choices in favor of the State, and its express factual findings and credibility choices, as well as the implicit findings that flow from the trial court's credibility choices, are presumed to be correct in this forum. 28 U.S.C. § 2254(e)(1); *Marshall v. Lonberger*, 459 U.S. 422, 433 (1983) (applying presumption of correctness to implicit finding against the defendant's credibility, where that finding was

necessarily part of the court's rejection of the defendant's claim); *Valdez v. Cockrell*, 274 F.3d 941, 948 (5th Cir. 2001) (presumption of correctness applies to both explicit and implicit findings necessary to support a state court's conclusions of mixed law and fact).

The TCCA implicitly adopted these determinations and determined that Madison's claims were without merit when it denied his state writ application without written order on the findings of the trial court. SHCR-01, at "Action Taken" Sheet, ECF No. 15-15. The state courts' determinations did not result in a decision "that was contrary to, or [that] involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." See 28 U.S.C. § 2254(d)(1). Therefore, Madison is not entitled to federal habeas relief. *See Id.*

For all of the above and foregoing reasons, Madison's § 2254 petition must be denied.

## III.    CONCLUSION

It is therefore **ORDERED** that Samuel Rochell Madison's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED**.  Further, pursuant to 28 U.S.C. § 2253(c), for the reasons discussed herein, a certificate of appealability is **DENIED**.

**SO ORDERED** on this **12th  day** of **June, 2023.**

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**